JOSEPHINE PETERSON AND DANIEL PETERSON, DE-
FENDANTS IN ERROR, v. CHRISTIAN CHRISTIAN-
SON, PLAINTIFF IN ERROR.

Submitted July 8, 1902—Decided November 17, 1902.

1. A husband should sue alone for the support, in his own household,
of a third person, though the services consisted largely of the per-
sonal attendance of his wife.
2. The objection that the wife was improperly joined as plaintiff is
not available unless raised by notice of misjoinder under section
37 of the Practice act.
3. It is not error to exclude evidence of a conversation between the
parties which is not shown to have been relevant to the issue.

On error to the Middlesex Circuit Court.

For the plaintiff in error, *Joseph E. Stricker* and *Alan H.
Strong.*

For the defendants in error, *Voorhees & Booraem.*

The opinion of the court was delivered by

ADAMS, J.   The declaration alleges that the defendant was
indebted to the plaintiffs "in the sum of one thousand dollars
for meat, drink, lodging, fire, candles, attendance, care, sup-
port, maintenance, clothing, goods, chattels and other neces-
saries by the said plaintiffs found and provided for an infant
child of the said defendant, named Georgianna Christianson,
from the twentieth day of February, eighteen hundred and
ninety-nine, to the eleventh day of March, nineteen hundred
and one, at his special instance and request." The declara-
tion then alleges that the defendant promised to pay the said
sum of money when requested so to do.   Then follow the
common counts.   The defendant pleaded the general issue.
The plaintiffs had a verdict.   Error has been assigned on
an exception to the exclusion of evidence and on a general
exception to the charge.

It is well to state the facts with some particularity, so as to see just what questions are brought up by the exceptions. The proof at the trial showed that Josephine Peterson and Daniel Peterson, the two plaintiffs, are husband and wife, and that Daniel Peterson is a brother of the defendant's first wife. The defendant lived at Perth Amboy, the plaintiffs in Newark. On February 24th, 1899, the defendant's first wife died, at her husband's house in Perth Amboy, leaving an infant one day old, whose name is Georgine, or Georgianna, Christianson. In this emergency, and a few hours before his wife's death, the defendant either sent for his sister-in-law, Josephine Peterson, or received her into his house as a caretaker. She came at once from her home in Newark and took charge of the child, becoming an inmate of the defendant's home in Perth Amboy. The defendant, at the time of his first wife's death, had eight children. He is a carpenter, was then earning good wages, and was able to support his family.

The evidence as to the domestic arrangements that followed Mrs. Christianson's death is not altogether clear. I will state the case as I understand it. The defendant testified that, on about the fourth day after his wife's death, Mrs. Peterson offered to take care of his house; that he assented; that both Mr. and Mrs. Peterson asked if they could have the child; that he gave them no satisfaction as to that, but simply said, "You will keep it, and I will pay you monthly for keeping it for me;" and that they said that they would have nothing for the keep of the child—that they would keep it for nothing. Mrs. Peterson testified that she did not at first expect any payment, but thought that if Mr. Christianson ever took the child away from her he would pay her for her services. There is no evidence of any unqualified contract for services and compensation to which both parties explicitly agreed. The understanding was loose and ill-defined. The question as to the ultimate custody of the child was the doubtful element in the case.

It seems that pretty soon after Mrs. Christianson's death the Petersons moved their furniture from Newark to Perth

Amboy, and lived for some months in the defendant's house. Mr. Peterson had been earning at Newark about $2.25 per day at pulling wool, and found employment at Perth Amboy after removing to that place. An adopted son came with them. He is referred to as "a little boy." Mrs. Peterson had her board for nothing in consideration of her acting as housekeeper. The adopted child paid $4 per week for his board. Mr. Peterson either paid, or was expected to pay, the same.

On September 20th, 1899, the defendant married again. His second wife was a sister of his first wife. About the 1st of September, 1899, or it may be earlier, the Petersons had moved from the defendant's house to another residence, taking the child with them, without objection from its father. A few days after his second marriage, or in the following October, Mr. Christianson called on Mrs. Peterson and said to her that he would take the baby, and she answered that if he did she wanted a legal settlement. He says that she refused to give the child up, and told him that he could not have it except by going to law. She testified that she did not render a bill, because she thought that the defendant did not mean to take the child. The defendant took no action at the time of this conversation, but on or about the 12th of April, 1901, possessed himself of the infant. This suit followed.

Mrs. Peterson testified that she gave the baby her personal attention, bought milk, medicine and clothes for it, paid $1 to a doctor, and owes something for medical attendance. There is nothing to show that the money expended on behalf of the child belonged to the separate estate of Mrs. Peterson, nor is there any distinct averment that the physician gave credit to her and not to her husband. She was conducting no trade or business.

The case presented, therefore, is the assertion by husband and wife of a cause of action on an implied contract for the value of the personal services of the wife in and about the support of a child during a little more than two years, and for disbursements in that behalf, the services being rendered

at first in the home of the child's father, where the wife's own husband and son also resided, and afterwards in a house occupied by her husband's family alone.

The state of facts here presented suggests the line of decisions adopted by this court in the case of *Garretson* v. *Appleton,* 29 *Vroom* 386. That was an action brought by a married woman, alone, against the executors of an estate, to recover for personal services rendered by her, in her husband's house, to the testator during a serious illness. It was there held that a wife can join as plaintiff with her husband when she is the meritorious cause of action, or the meritorious consideration passes from her, and the action is grounded upon an express contract or promise to pay her a certain sum; that without such express contract or promise to pay she cannot join in the action or sue in her own name, unless, of course, she is carrying on a separate business; and that a wife is not entitled to join with her husband, or to sue in her own name alone, for the care, attendance upon and nursing of a sick boarder of her husband in the household, although the services are of an unusual character, and although they consist exclusively of her own personal services to the boarder.

In the case in hand there was no motion to nonsuit, and no motion to direct a verdict for the defendant. It is now insisted that the right of action was in the husband, and that the wife should not have been joined as a plaintiff. Both propositions are true, but the objection of misjoinder is not now available, as it was not presented in the manner pointed out by section 37 of the Practice act. The charge of the judge, so far as it dealt merely with matters of law, was elementary and undeniable. The jury were told that contracts are of two kinds, express and implied; that an implied contract is often as strong as a verbal contract; that it was for them to determine whether either an express or an implied contract existed; that if they found that there was either, they might find a verdict for the plaintiff, and that if they thought that there was neither, then, of course, the verdict must be for the defendant. The trial judge's application of the law to the facts was substantially this: He

presented to the mind of the jury two opposing views of the controversy; on the one hand, that the work, care and expense were assumed voluntarily and without expectation of compensation, in which case their verdict must be for the defendant; and, on the other hand, that, if the proof did not sustain the foregoing view, then, since the services were rendered by the father's request, or at least with his consent, and he had the benefit of them, the law would imply a promise of payment, and their verdict must be for the plaintiff; in short, that the question was whether the relation of the parties was friendly or financial—on the footing of sentiment, or of dollars and cents. There was a general exception to the charge, without specification of any ground of objection. No error so far appears.

There were two requests to charge that were virtually denied. Then followed the general exception to the charge, and this may fairly be thought to apply to what the trial judge said in commenting on these two requests.

The first request was this:

"That the plaintiff cannot recover anything beyond the time that the demand for the child was made, on September 5th, 1899—that is, if the jury believe the contention of the defendant." The meaning here of the much abused word "contention" is not quite clear. It probably means the testimony on behalf of the defendant. The evidence for the defendant on this point was that of Mr. Christianson himself and of Nels Hansen. The date specified in the exception seems to be wrong. The defendant testified, on direct examination, in answer to questions, as follows:

"*Q.* What, if anything, did you ever do to get the child back?

"*A.* I didn't do anything to get it back until after I was married, which was on the 20th of September.

"*Q.* What did you do then?

"*A.* A couple of days thereafter I went over to Mr. and Mrs. Peterson and demanded the child.

"*Q.* What did you say on that occasion?

"*A*. I met Mr. Peterson in the room, and I said to him, in the Norwegian language, that I came for to get the child, and, of course, I said we would also break our relationship; he said I could have it, .and so he called his wife out, and she heard of it.

"*Q*. What did she say?

"*A*. She swore at me and called me names, and said I could not have that child except by going to law, and she said it took twelve men to budge her, and, at the same time, she drove her knuckles into the table."

Nels Hansen testified, on direct examination, in answer to questions, as follows:

"*Q*. Were you there at the time when Mr. Christianson came for his child?

"*A*. Yes, sir.

"*Q*. Do you know what was said?

"*A*. Mr. Christianson came in—I was not there just at the time, but I came in while they were there.

"*Q*. What did you hear him say?

"*A*. He came in and demanded that he wanted the child, and that he was willing to pay for the time they had the child.

"*Q*. That he was willing to pay up to that time?

"*A*. Yes, sir.

"*Q*. What did Mrs. Peterson say?

"*A*. She said if he wanted the child he would have to bring her through law."

His cross-examination is to the same effect.

The general proposition that underlies the request is this: That a father, who is boarding out a young child, and who is told by the caretaker that she will not give it up except on compulsion of law, may then sleep for an indefinite period on his undoubted paternal right, and in the meantime get the board of the child for nothing. This is not sound. The question is one of mixed law and fact, and it was for the jury to say whether the father's inaction for about a year and a half afforded satisfactory evidence of acquiescence in the existing situation, and whether one of the features of the ex-

isting situation was an implied promise to pay.    To refuse this request was not error.

The other request to charge was this:

"That there must be a meeting of the minds to constitute an implied contract."    The learned judge did not, in express terms, refuse this request.    He might safely have done so.

It remains to consider an exception to the exclusion of evidence.    It was taken during the direct examination of the defendant.    The record is as follows:

"*Q.* Since this suit was brought, have you had any conversation with Daniel Peterson?

"*A.* I have, occasionally.

"*Q.* Where have you had them?

"*A.* On the street or in McCormick's grocery store.

"*Q.* Can you fix the time?

"*A.* It was in the afternoon of a day in the first of December.

"*Q.* After that you received a summons?

"*A.* Something like three months after.

"*Q.* What did you say?

"[Objected to on the ground that anything that was said would not bind the wife, not being in her presence.]

"Mr. Stricker—I offer this on the ground that the declaration recites that the defendant is indebted to the plaintiffs for meat, drink, lodging, &c., and that, inasmuch as the husband is the head of the family, that portion of the damages, if any, for the meat, drink, &c., would accrue to him."

There was no error in excluding this evidence.    It was objectionable, not because it would not bind the wife, but because it was not shown that the conversation between the defendant and Daniel Peterson related to the subject of the suit.    For all that appears, it may have been entirely irrelevant to the controversy between the parties.

Two exceptions to the admission of evidence were allowed and sealed.    As no error has been assigned on either of these exceptions, we do not consider them.

The judgment is affirmed.

*39 Vroom.* Church Holy Com. v. Paterson, &c., R. R. Co.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, DIXON, COLLINS, FORT, GARRETSON, HENDRICKSON, PITNEY, BOGERT, ADAMS, VREDENBURGH, VOORHEES, VROOM. 14.

*For reversal*—None.